***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Houser, with modifications.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement, which was marked as Stipulated Exhibit (1), and admitted into the record as:
 STIPULATIONS
1. At all relevant times herein, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The date upon which plaintiff's injury occurred is July 18, 2000.
3. An employment relationship existed between plaintiff-employee and Hensley Construction on July 18, 2000.
4. Dennis Insurance Group was carrier on the risk at all relevant times herein.
5. Plaintiff's average weekly wage on July 18, 2000 was $480.00.
6. At the hearing before the Deputy Commissioner, the parties submitted the following:
 a. A Packet of Medical Records, which was marked as Stipulated Exhibit (2), and admitted into the record;
 b. Defendants' Answers to Plaintiff's Interrogatories, which were marked collectively as Stipulated Exhibit (3), and admitted into the record; and,
 c. Plaintiff's Answers to Defendants' Interrogatories, which were marked collectively as Stipulated Exhibit (4), and admitted into the record.
7. The issues for determination are:
 a. Whether plaintiff sustained compensable injuries arising out of and in the course of his employment with Hensley Construction on July 18, 2000;
b. If so, to what benefits is plaintiff entitled;
 c. Whether defendants are to be responsible for the medical expenses incurred or to be incurred by plaintiff as the result of the July 18, 2000 incident; and,
d. Whether plaintiff's claim is barred by G.S. § 97-12.
 ***********
Based upon the evidence of record and reasonable inferences flowing therefrom, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-five (45) years old. He was born May 20, 1956. Plaintiff did not complete high school and has no other formal training or education. Plaintiff is 5'7" tall, and weighs 168 pounds.
2. Plaintiff is a self-taught carpenter and has done carpentry work for his entire work life. He has primarily done framing and trim carpentry. At the time of his injury on July 18, 2000, plaintiff had worked for Hensley Construction for approximately one month. However, he had worked under the owner, Keith Hensley, for approximately eight years on other construction projects while Mr. Hensley was the foreman for McCarroll Construction. Keith Hensley and plaintiff are personal friends, and have been for many years. Mr. Hensley and plaintiff have socialized with each other a lot over the years (which primarily consisted of drinking beer together). By the time of his July 18, 2000 injury, Mr. Hensley was well aware of plaintiff's drinking pattern and job skills. Keith Hensley did not appear at the hearing before the Deputy Commissioner. Hensley had once fired plaintiff from another job when he learned that plaintiff had been drinking on that job. Plaintiff's work history involves jobs in the carpentry industry. As a carpenter, plaintiff has mostly performed framing and trimming work. Plaintiff began his employment with Hensley Construction as a carpenter in June 2000, working on a project at the Carolina Day School in Asheville. Plaintiff was primarily performing framing and roofing work at this site.
3. On July 18, 2000, plaintiff was preparing to begin his work for Hensley Construction at its Carolina Day School project site. He was preparing to fill nail or dowel holes in the fascia so that the fascia could be painted by the painters. He leaned his ladder against a fascia board so that he could reach the level necessary to fill the nail holes. The ground where plaintiff placed the ladder was rough, and there may have been some mud in the general area, but there was no mud where he placed the ladder. In his many years of carpentry work plaintiff had a lot of experience with placing and climbing ladders, and he had never before fallen off one. Plaintiff was not feeling the effects of alcohol at the time of his injury.
4. Plaintiff intended to tie off his ladder to secure it, as required by OSHA regulations. As plaintiff began climbing the ladder, which he had to do in order to tie it off, it slipped and plaintiff and the ladder fell to the ground. Plaintiff's head hit a concrete slab to the right of where the ladder had been placed. Plaintiff does not know what caused the ladder to fall. There were no other workers in the vicinity of plaintiff when this incident occurred, or when plaintiff was setting up his ladder. Defendants presented no witnesses to testify that plaintiff was intoxicated on the morning of July 18, or that they smelled alcohol on his breath, or that plaintiff was unsteady on his feet, or that he showed any signs of alcohol impairment.
5. Following the incident, coworkers found plaintiff unconscious. He was taken to Mission Memorial Hospital in Asheville. At the hospital, a CT scan revealed a right occipital skull fracture and a sub occipital epidural hematoma. Upon plaintiff's admission to Mission Memorial Hospital, a serum blood preparation revealed a test result of .10 ethanol alcohol, at 8:44 a.m. A .10 serum blood preparation is the equivalent of a .086 whole blood value, the type of breathalyzer reading that is familiar to most people.
6. Plaintiff underwent an emergency craniotomy to evacuate the hematoma, and a large blood clot was successfully removed. Plaintiff remained hospitalized for ten days, and then began rehabilitation.
7. On July 28, 2000, plaintiff was admitted to Thoms Rehabilitation Hospital. At that facility, plaintiff's primary physician was Dr. Edgardo Diez, who diagnosed him as having sustained a severe closed head injury. While an inpatient at Thoms, plaintiff complained of chest pains. An x-ray taken on August 2, 2000 revealed five fractured ribs on the right side (the fifth, seventh, eighth, ninth, and tenth ribs), for which plaintiff was treated with pain medications. The reason it took two weeks for this injury to become manifest was due to the confusion plaintiff experienced from his traumatic brain injury. While at Thoms, plaintiff underwent physical therapy, occupational therapy and speech therapy. Despite these rehabilitative efforts, it was eventually determined that plaintiff's brain injury is permanent in nature. Plaintiff will continue experiencing problems with thoughts, paying attention, concentration, as well as experiencing headaches and problems with his balance. Plaintiff was discharged from Thoms Rehabilitation Hospital on August 8, 2000, into the care of his wife, who was to provide 24 hour supervision for plaintiff.
8. At the time plaintiff was admitted to Mission Memorial Hospital on July 18, 2000, he had a blood alcohol level of .10 (or .086 as previously discussed). On July 17, 2000, plaintiff worked from 7:30 a.m. to 4:00 p.m. Following work, plaintiff walked to a store near the job site and bought a 12-pack of beer. Plaintiff then sat in the woods drinking the beer and awaited the arrival of Tim Arnold, a friend who gave plaintiff rides to and from work.
9. Having been picked up by Mr. Arnold and beginning to proceed home, plaintiff and Mr. Arnold stopped at another store and bought a second 12-pack of beer. Plaintiff and Mr. Arnold arrived at plaintiff's home at approximately 6:30 p.m. Mr. Arnold did not consume any beer that evening due to prescription medications he was taking. On July 17, 2000, plaintiff ate a sandwich for dinner, consumed the remainder of both 12-packs of beer, and perhaps additional beers, until 12:00 midnight, when he went to sleep.
10. At the hearing before the Deputy Commissioner, without reservation, plaintiff testified that he began drinking at the age of 14, and that for nearly 30 years had consumed approximately 24 beers every day. Plaintiff further testified that the amount of beer he consumed on the evening of July 17, 2000 within the time span established was normal for him, matching his nearly 30-year daily pattern. On the morning of July 18, 2000, plaintiff slept until approximately 6:00 a.m., and following his usual practice, had a soft drink for breakfast. Plaintiff testified that he felt fine and normal that morning. At approximately 7:00 a.m., plaintiff was picked up by Mr. Arnold, and he arrived at Hensley Construction's job site at approximately 7:30 a.m.
11. Regarding the issue of intoxication, plaintiff testified that he did not feel at all intoxicated on the morning of July 18, 2000. Plaintiff's wife, Anita Sherwood, was awake and in the home while plaintiff was preparing for work and spoke with him on the morning in question. Plaintiff did not appear at all intoxicated, spoke in his usual manner, and was not unsteady on his feet. Overall, plaintiff's wife noticed nothing different with plaintiff or his behavior on the morning of July 18, 2000 as compared with other mornings in their home.
12. Tim Arnold also testified at the hearing before the Deputy Commissioner regarding plaintiff's appearance and behavior on the morning of July 18, 2000. Mr. Arnold was able to observe plaintiff during the approximately 30-minute drive to Hensley Construction's job site and had observed plaintiff on numerous other mornings. During the drive, he and plaintiff carried on a normal conversation, without slurring or anything unusual regarding plaintiff's speech. Mr. Arnold could detect no alcohol on plaintiff's breath and observed plaintiff walking in his usual manner, with no unsteadiness. Overall, Mr. Arnold noticed nothing different with plaintiff or his behavior on the morning of July 18, 2000.
13. Dr. Hugh Burford, PhD, is a pharmacologist who testified as an expert witness in this matter. He testified, and the Full Commission finds as fact, that, based upon plaintiff's history of alcohol consumption, plaintiff would have high tolerance to alcohol and its effects. Dr. Burford rendered the further opinion that, based upon plaintiff's tolerance to alcohol and a blood level of .10, plaintiff would not have been impaired on the morning of July 18, 2000. According to Dr. Burford, it would take two to three times the blood alcohol content that plaintiff had on the morning in question for plaintiff to become impaired. In the expert opinion of Dr. Burford, plaintiff's blood alcohol level on July 18, 2000 was not a cause of his fall from the ladder and subsequent injuries.
14. In this matter, defendants have raised as an issue the effect of plaintiff's blood alcohol level on his judgment in determining where to place the ladder on the date of the incident in question. Since there was no evidence that the ladder fell because it had not been placed properly, defendants' conjecture that plaintiff's blood alcohol played a part in the improper placement of the ladder is pure speculation.
15. Mark Bartalini, who has a Master's degree in toxicology, also testified as an expert witness regarding the effects of plaintiff's blood alcohol level on the date of his injury. From plaintiff's history of alcohol consumption, Mr. Bartalini opined that plaintiff has alcohol induced permanent brain damage. Based upon a combination of this alcohol induced brain damage and plaintiff s blood alcohol level at the time of the fall from the ladder, Mr. Bartalini further opined that plaintiff was impaired when he fell from the ladder on July 18, 2000.
16. During his deposition, Mr. Bartalini admitted that as a toxicologist he would defer to a medical doctor to determine whether plaintiff had brain damage from long-term alcohol consumption. Mr. Bartalini never met plaintiff nor examined any CT scans or MRI studies of plaintiff's brain, nor conducted any other tests supporting his opinion that plaintiff had alcohol induced brain damage. Further, Mr. Bartalini admitted that he had no medical evidence to support his assumption that plaintiff had alcohol induced brain damage prior to his fall on July 18, 2000.
17. On the issue of whether plaintiff's blood alcohol level on July 18, 2000 combined with permanent brain damage from alcohol was the cause of the incident in question, and the injuries sustained, greater weight is given to the opinions of Dr. Burford than those of Mr. Bartalini, given the fact that Mr. Bartalini admitted that he had no medical evidence to support his theory regarding permanent brain damage or its effects. Dr. Burford, on the other hand, testified that permanent brain damage from chronic alcohol consumption is hard to diagnose and cannot be assumed. Diagnosis is usually done after death, by a pathologist.
18. The circumstances of plaintiff's injury on July 18, 2000 constituted an interruption of his regular work routine, and the introduction thereby of unusual conditions likely to result in unexpected consequences.
19. On July 18, 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment with Hensley Construction.
20. As a direct and natural result of his July 18, 2000 injury by accident and closed head injury, plaintiff developed a seizure disorder for which he continues to require medical treatment. Plaintiff's traumatic brain injury has resulted in permanent impairments, that ". . . he will have permanent damage with dizziness, hearing loss, memory, what we call high-level cognitive functions . . . that translates to difficulty with attention, concentration, adolescent complex, thinking thoughts, also, he will experience some permanent damage regarding being more impulsive, more susceptible for depression, and being more irritable or short-tempered on occasions. In terms of the pain he also may experience some permanent pain, not just because of the rib fracture but also because of headaches that he may experience on sporadic basis," according to Dr. Diez, and which the Full Commission finds as fact. Plaintiff will need further treatment in the future, including but not limited to psychological counseling, antidepressant medication, and pain medications.
21. At the time of his injury by accident, plaintiff was not intoxicated.
22. Plaintiff has not reached maximum medical improvement and continues to receive medical treatment for his closed head injury and seizure disorder from Dr. G.S. Metcalf.
23. Plaintiff's average weekly wage on July 18, 2000 was $480.00, which yields a compensation rate of $320.16. Due to the nature of his injuries and his limited education and work experience, plaintiff likely will be unable to earn wages for the remainder of his life.
24. Insufficient evidence was introduced upon which to enter a finding on whether or not, as the result of his July 18, 2000 injury by accident, plaintiff sustained a compensable loss of hearing, a serious disfigurement due to a missing front tooth, or a compensable claim regarding any sexual dysfunction.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On July 18, 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment with Hensley Construction. G.S. § 97-2(6). As a direct and natural result of his July 18, 2000 injury by accident and closed head injury, plaintiff developed a seizure disorder, a right occipital skull fracture, a sub occipital epidural hematoma, five fractured ribs on the right side, and injuries to his brain. Due to his compensable injuries plaintiff will continue experiencing problems with thoughts, paying attention, concentration, as well as experiencing headaches and problems with his balance.
2. The employer bears the burden of establishing that intoxication was a proximate cause of the injury. Sidney v. Raleigh Paving 
Patching, 109 N.C. App. 254, 256, 426 S.E.2d 424, 426 (1993). To establish proximate cause under section 97-12, an employer must show that "it is more probable than not that intoxication was a cause in fact of the injury," but need not show that intoxication was "a sole cause." Id.
Here, the conflicting evidence showed that plaintiff was not intoxicated, that the day before the accident he consumed approximately the same amount of alcohol he had consumed every day for the past 30 years and that he showed no signs of intoxication on the day of the accident. The evidence established that he was a chronic functional alcoholic. See Pearson v. C.P. Buckner Steel, IC No. 232290 (1995), affirmed in a non-published opinion by the N.C. Court of Appeals at127 N.C. App. 209, 490 S.E.2d 252 (1997). Additionally, the evidence showed that the owner of Hensley Construction was well-acquainted with plaintiff's drinking and its effect on his ability to work, having worked alongside plaintiff for the eight years just preceding the establishment of Hensley Construction and the hiring by Hensley Construction of plaintiff.
4. Willey vs. Williamson Produce,N.C. App., 562 S.E.2d 1 (2002), is distinguishable from the case at issue. In. Willey, claimant's deceased was killed while driving a commercial truck and was found to have had cocaine and marijuana in his urine at the time of death. In its decision, a divided Court of Appeals held that "[o]nce the employer proves use of a non-prescribed controlled substance, it is presumed that the employee was impaired," thus creating a rebuttable presumption of intoxication. Here, a blood alcohol level of .086 does not create a rebuttable presumption of intoxication. Even if it did, plaintiff's expert witness provided ample evidence to rebut the presumption. InWilley the claimant had been driving erratically for some period of time prior to his accident. In the instant case, there was no evidence of erratic behavior on the part of plaintiff. The fact that plaintiff placed the ladder that fell is not evidence of intoxication. Ladders fall for other reasons than intoxication or improper placement.
5. As the result of his July 18, 2000 injury by accident, plaintiff is entitled to be paid by defendants ongoing total disability compensation at the rate of $320.00 per week for the period of July 18, 2000 through the present and continuing until such time as plaintiff is able to return to work at the same or greater wages than $480.00 per week, or until further order of the Commission. N.C. Gen. Stat. § 97-29.
6. As the result of his July 18, 2000 injury by accident, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred necessary to provide relief, lessen disability or shorten the healing period. As a result of his compensable injury, medical treatment was necessary. Additionally, plaintiff has shown that there is a substantial risk of the necessity of future medical compensation for plaintiff. N.C. Gen. Stat. §§ 97-25, 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney fees set forth below, defendants shall pay to plaintiff ongoing total disability compensation at the rate of $320.00 per week for the period of July 18, 2000 through the present and continuing until such time as plaintiff is able to return to work, or until further order of the Commission. The amount of compensation which has accrued shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein. Defendants shall pay interest at 8% per year on outstanding amounts from August 24, 2001 until paid.
2. Of the lump sum amount, defendants shall pay 25% directly to plaintiff's counsel as reasonable attorney fees. With respect to continuing weekly compensation benefits, defendants shall pay every fourth check directly to plaintiff's counsel as reasonable attorney fees.
3. Defendants shall pay for all reasonable medical treatment necessary to provide relief, lessen disability or shorten the healing period.
4. Defendants shall pay future necessary medical compensation.
5. Defendants shall pay the costs, including expert witness fees, if not already paid, to Dr. Edgardo Diez, Dr. G.S. Metcalf, and Hugh J. Burford, Ph.D.
This 25th day of September 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER